PRIMITIVO HERNÁNDEZ y su esposa ANTONIA CAMACHO, demandantes y apelados, *v.* ISMAEL ACOSTA PADILLA y MARYLAND CASUALTY Co., demandados y apelantes.

Núm. 8910.—*Sometido:* Junio 1, 1944. *Resuelto:* Noviembre 24, 1944.

*Oscar Souffront,* abogado de los apelantes; *J. Alemañy Sosa,* abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Se trata de una acción de daños y perjuicios por la muerte de un niño de seis años de edad, hijo de los demandantes. La Corte de Distrito de Mayagüez condenó a los demandados a pagarles $3,500 en concepto de indemnización, más $300 de honorarios de abogado.

En este recurso si bien los demandados señalan la comisión de nueve errores, los consideraremos y resolveremos conjuntamente por entender que, en su mayoría y en distinta forma se reducen a plantear una sola cuestión fundamental, a saber: ¿actuó la corte sentenciadora con pasión, prejuicio y parcialidad o cometió manifiesto error al apreciar la prueba? Veamos los hechos y la prueba.

Los demandantes viven desde algunos años en una casa propiedad de Miguel Carlo Pabón, enclavada en una finca de éste, en el barrio Llanos Costa del Municipio de Cabo Rojo. La casa se halla dividida en dos secciones, una rectangular que forma su cuerpo principal que contiene la sala y una habitación, y otra en forma de colgadizo, que da al patio de la casa, y donde se halla la cocina. El frente de dicha casa se encuentra a una distancia alrededor de 114 metros de un camino vecinal que en dirección de Este a Oeste llega hasta el mar, sitio donde se hallan unas salinas propiedad también de don Miguel Carlo Pabón. De dicho camino vecinal parte un camino privado que atraviesa la finca del Sr. Carlo en dirección de Sur a Norte, describiendo una curva precisamente alrededor de la casa mencionada y pasando luego por el lado del patio de la cocina. El demandado, Ismael Acosta Padilla, es uno de los compradores de sal de los establecimientos del Sr. Carlo, y como tal, le era

permitido conducir sus *trucks* por el mencionado camino privado, haciendo ya algún tiempo que lo utilizaba pasando por la casa de los demandantes, teniendo así conocimiento de que en la casa que ocupaban éstos vivían niños.

El día 26 de julio de 1943, como a las diez de la mañana, el demandado mencionado conducía un truck de su propiedad cargado de sal por el camino vecinal. Al llegar al portón donde comienza el camino privado, tocó *claxon,* dobló y continuó entonces por el camino privado en dirección de Sur a Norte a una velocidad moderada. La demandante Antonia Camacho se hallaba en la cocina de su casa en compañía de su hijo Pedrito Hernández, de seis años de edad. Al estar doblando el truck por la curva alrededor de la casa, salió corriendo dicho niño de la cocina, se tiró al patio aparentemente con la intención de cruzar el camino yendo a chocar con el lado derecho trasero del truck. El golpe que recibió el niño en la cabeza fué de tal naturaleza que cayó muerto instantáneamente en la misma línea divisoria entre el patio y el camino.

Para una debida apreciación de los hechos se hace necesario hacer un resumen de lo que declararon los testigos de una y otra parte. Omitiremos únicamente los testimonios del fotógrafo que se limitó a identificar las fotografías que tomó del sitio del suceso. La prueba de los demandantes fué la siguiente:

■ *Primitivo Hernández* declaró haber llegado a su casa el día de autos como a las diez y media de la mañana, encontrando muerto a su hijo Pedrito en una cama; que encontró la mancha de su sangre en el patio de la casa, a una distancia de *1 metro 70 centímetros* de la esquina de la casa, y a *5 metros 40 centímetros* de la puerta de la cocina; que el camino privado tiene un ancho de 4 metros, pero al formar la curva tiene 7 metros de ancho; que los árboles que bordean el camino donde forma la curva están a una distancia de 8 a 13 metros de la casa; y del primer árbol a la esquina de la casa, donde abre la curva, hay 11 metros 30 cen-

tímetros; que el demandado pasaba frecuentemente por su casa, en ocasiones de dos o tres veces al día; que en una ocasión el demandado le mató un perro y él le llamó la atención en el sentido de que tomara más precauciones ya que en la casa habían varios niños pequeños.

*Santos Colberg* dijo que el día de los sucesos se dirigía a la casa de los demandantes, de quien era vecino; que cuando se hallaba a una distancia de 40 a 50 pasos vió venir un truck por el camino a una velocidad mínima y *oyó que el truck tocó claxon;* que hacía un fuerte viento del Norte; que el truck iba llegando a la casa cuando el niño salió de la parte de atrás de ésta hacia el camino, pero él no alcanzó a ver el accidente por taparle el truck la vista; que el truck *le debe haber dado al niño con la parte de atrás del costado derecho, pues ya la parte del frente había pasado;* que la mancha de sangre donde cayó el niño se hallaba frente a la cocina, más o menos en una línea dividiendo el patio y el camino.

*Agustín Montero* testificó que el día de autos venía de las salinas de don Miguel Carlo Pabón, donde trabaja, en el truck de Ismael Acosta Padilla, sentado al frente con éste; que ese día soplaba mucho viento del Norte; que el truck se detuvo en el portón que da acceso al camino privado en cuestión desde el camino público, tocó *claxon* y luego continuó a una velocidad mínima por dicho camino privado, *el cual se ensancha como dos metros al llegar a la casa,* y allí pasó como a *dos o tres* metros de la cocina, pero la caja del truck pasó más pegada, como a *metro y medio,* de la casa en sí; que cuando ya *iban pasando vió al niño salir corriendo de la cocina* a cruzar el camino; que el peón que iba atrás dijo "Párate que mataste este niño", y el truck paró rápidamente. En lo que se apearon sólo transcurrieron uno o dos minutos, y ya el niño estaba muerto. La sangre donde había caído el niño estaba en la línea que divide el patio del camino. Aunque él no vió el choque del niño y el truck, *el vehículo lo debe haber cogido con la parte trasera.* El cuerpo

de la casa impide en tal forma la vista, que una persona que salga de la cocina para el camino no puede ver un carro que venga de frente.

*Antonia Camacho,* madre del niño, dijo que el día del accidente se hallaba cocinando en compañía del niño, cuando su hijo se *tiró corriendo hacia el camino. Al mismo tiempo pasaba el truck* y al ella asomarse, vió el niño tendido en el patio, de donde lo recogió muerto. No oyó venir ni tocar al truck y sólo tuvo conocimiento de su paso cuando lo sintió pasar por la cocina, en el momento de asomarse. No vió cuando el truck mató al niño por hallarse de espaldas. Recogió el niño del suelo más para el patio de la casa que para el camino.

Aquí terminó la evidencia presentada por los demandantes, y continuó desfilando la prueba de los demandados con la declaración de:

*Alfredo Acosta* quien declaró que el día de autos venía sentado sobre los sacos de sal en la parte de atrás del truck, el cual era conducido a una velocidad de 6 a 8 millas; que el chófer demandado tocó *claxon en el portón donde comienza el camino privado;* que al llegar a la casa, no oyó ninguna clase de aviso del truck; que al pasar por la casa *vió a un niño salir corriendo sin darse cuenta que el truck pasaba,* y chocó con la caja en el lado derecho, cayendo al suelo; que el truck se detuvo inmediatamente, quedando pegado de la casa. Que una persona que salga de la casa para el camino no puede ver un truck que venga de frente, pero que si el truck ha pasado la curva puede verlo y que el truck en este caso ya había pasado la curva y hasta su parte de atrás había pasado la curva.

*Ismael Acosta Padilla,* el co-demandado, declaró que hacía dos o tres años él estaba pasando por la casa de Primitivo Hernández, habiendo visto niños allí en diversas ocasiones; que el día del accidente él venía de las salinas de don Miguel Carlo conduciendo su propio truck; que antes de llegar a la casa, cuando llegó al portón, detuvo la marcha

y tocó bocina, y luego siguió con el truck en segunda, a una velocidad de 8 ó 10 millas; que iba a menos velocidad cuando cogió la curva; que antes de coger ésta no tocó *claxon;* que no vió a nadie interceptar el tránsito del truck; que al coger la curva del recodo que forma la parte principal de la casa y estar pasando por el lado de la casa, *sintió un cantazo* en el costado derecho del vehículo y paró su marcha quedando frente a la cocina; que él en ningún momento vió el niño.

*Dr. Enrique Encarnación* declaró que había hecho un examen (no una autopsia) del cuerpo del niño al día siguiente del accidente, y que el mismo presentaba dos fuertes contusiones, una en el muslo derecho y otra en la frente. Que la muerte se debió a un *shock* traumático, causado por un golpe brutal con repercusión en el cerebro, pero que por el carácter de las heridas el niño no pudo ser pisado por el truck.

Al apreciar toda esta prueba la corte inferior llegó a la conclusión de que "la muerte del referido niño tuvo como causa próxima e inmediata la culpa y negligencia del chófer Ismael Acosta Padilla al conducir su truck por el camino privado . . . . sin dar aviso alguno de su proximidad a la casa ocupada por los demandantes y sus niños, no obstante existir una curva bastante pronunciada al llegar a la casa y quedar ésta casi en el mismo centro de la curva del camino que se acentúa y se ensancha cuando llega a la casa y teniendo espacio suficiente para pasar el truck bastante retirado de la casa guió el mismo pegado a la casa, en forma que aún a una persona mayor que hubiese tratado de salir al camino por la puerta trasera de la casa le hubiera sido difícil salvarse de ser arrollada y muerta por el truck en el mismo sitio donde fué muerto el niño hijo de los demandantes". En cuanto a la actuación del niño dice la corte que "a lo más que puede llegarse . . . . es que el niño salió corriendo de la cocina para el camino sin fijarse que el truck pasaba en ese momento" y sostuvo que no fué negligente

pues por su edad "solamente podría imputársele si el niño hubiese hecho alguna cosa que otros niños de su misma edad y de las mismas condiciones y circunstancias que él, hubieran realizado de una manera completamente distinta". La corte hizo constar, además, que el truck iba despacio en el momento del accidente y había tocado *claxon* en el portón.

En síntesis, la corte consideró que la causa próxima del accidente, consistente en negligencia por parte del demandado Acosta, se debió: 1ro.—al no haber tocado señal de aviso antes de tomar la curva cuando sabía que en dicho sitio habían niños y 2do. al coger la curva pegado a la casa de los demandantes cuando existía sitio suficiente en el camino para haber pasado retirado de la casa.

Consistente y repetida es nuestra jurisprudencia sosteniendo la doctrina de que no revocaremos una sentencia basada en un error como el planteado en este caso a menos que el mismo quede plenamente demostrado. Nos inclinamos siempre a respetar las conclusiones de hecho a que llegan las cortes inferiores siempre que al apreciar la prueba y dirimir el conflicto que en ella pueda haber se ajusten a lo que la misma prueba demuestre o tienda a establecer. Empero, cuando de la misma prueba aparece que no existe conflicto alguno y que en su apreciación del hecho fundamental envuelto se ha actuado con pasión, prejuicio y parcialidad o que se ha cometido manifiesto error, en ese único caso, es que nos vemos precisados a revocar la sentencia.

Hemos estudiado cuidadosamente las distintas cuestiones planteadas en el extenso y bien preparado alegato de los apelantes pero no hemos quedado convencidos de que la corte sentenciadora, dentro de las circunstancias concurrentes en este caso, actuara movida por pasión, prejuicio y parcialidad o cometiera manifiesto error al apreciar la prueba. El caso está, al igual que dijimos del de *Castro* v. *González*, 58 D.P.R. 368, 381 "en la línea fronteriza y pudo haberse resuelto en uno u otro sentido—según se diese crédito a la prueba de una u otra parte", especialmente en cuanto al

momento en que el niño salió corriendo de la cocina de su casa. La corte inferior no dió crédito a la prueba en el sentido de que ya el truck estaba pasando por frente a la cocina cuando el niño salió corriendo y sí a las declaraciones tanto de los testigos del demandante como a los del propio demandado, corroborada por la inspección ocular, de que el sitio donde cayó muerto el niño, demostrado por la mancha de sangre, se hallaba en la línea divisoria del camino y el patio y que el truck estaba tomando la curva a la casa cuando, como declaró el demandado Acosta, de pronto sintió el golpe del choque.

▆ Consideramos de suma importancia en este caso el hecho probado por los demandantes y admitido por el demandado de que él sabía que en la casa vivían varios niños y además que el demandante le había llamado la atención en ocasión de haberle matado un perro, de que tuviera cuidado al guiar, pues él sabía que allí habían niños pequeños.

Si tanto de la prueba como de la inspección ocular practicada por la corte, aparece que el camino privado antes de llegar a la casa se extiende en la curva a una distancia de más de seis metros, existiendo, por tanto, sitio amplio por donde conducir un vehículo sin necesidad de tomar la curva al pasar por la casa a una distancia menor de dos metros y si demuestra además la prueba y la inspección ocular que el sitio donde quedó la mancha de sangre, donde cayó muerto el niño, fué en la línea divisoria del camino con el patio de la casa a una distancia de un metro setenta centímetros de la esquina posterior del cuerpo principal de la casa, y a eso unimos el hecho probado y admitido por el demandado de que no tocó señal de aviso alguno ni al acercarse a la casa ni al tomar la curva, forzoso es concluir que la corte inferior no cometió error al resolver que el demandado Acosta fué negligente y que esa negligencia fué la causa próxima del accidente.

▆ El hecho de que el niño chocara con el lado del truck y que el demandado no lo hubiera visto antes de ser-

tir el golpe no es, dadas las circunstancias especiales de este caso, suficiente para eximir de responsabilidad a los demandados. Como se dijo en el caso de *Messer* v. *Gentry*, 290 S. W. 1014, 1016: "Si el demandado por su negligencia llevó su vehículo al sitio donde el niño chocó contra él (por el lado), él es tan responsable como si le hubiera dado al niño con la parte delantera del carro". Si, como hemos dicho, el demandado fué negligente al no dar aviso antes de tomar la curvã con su truck y al pasar a tan poca distancia de la casa, sabiendo como sabía que en dicho sitio vivían niños, el hecho de que el niño lesionado saliera corriendo por el patio de su casa en ese mismo momento y pudiera chocar contra el lado del truck debió haber sido previsto por el demandado Acosta y por tanto no debe eximir de responsabilidad a los demandados. El niño tenía derecho a estar y correr en el sitio en que se encontraba; no podía ver que se aproximaba un vehículo (se probó que desde el patio frente a la cocina no podía verse el camino antes de la curva) e independiente mente del motivo que tuvo para salir corriendo, su actuación no puede considerarse como constitutiva de *negligencia contribuyente*. No es que resolvamos que un niño no pueda incurrir en dicha negligencia sino, primero, que no fué probada en este caso y segundo, que no podemos sostener que el hijo de los demandantes actuara, bajo las circunstancias concurrentes en forma distinta a como hubiera actuado cualquier otro niño de su misma edad, inteligencia y preparación. Desde el año 1914 esta Corte, en el caso de *Font* v. *P. R. Ry., Lt. & P. Co.*, 21 D.P.R. 7, al considerar la capacidad de un niño para incurrir en negligencia se explicó así: "Si bien la ley no exige a los niños el mismo grado de cuidado que a los adultos y no obstante ser la edad e inteligencia de una persona factores importantes al tomarse en consideración el hecho de si se ha ejercitado o no el debido cuidado, la demandante en este caso estaba sin embargo obligada a ejercitar aquel grado de cuidado que por lo general acostum-

bran observar los niños prudentes de la misma edad e inteligencia en casos semejantes''.

Esta doctrina es igual a la regla expuesta en 2 *Restatement of the Law, Torts, Negligence,* Sec. 464, (2) pág. 1228, en esta forma:

"(2) La norma de conducta a que un niño debe sujetarse es aquella que puede esperarse de un niño de similar edad, inteligencia y experiencia''.

Al comentarse esta regla el Restatement hace referencia al comentario a la sección 283, que expone lo que debe ser la conducta de un hombre razonable (''A menos que el actor sea un niño o un demente, la norma de conducta a que debe sujetarse para evitar ser negligente es aquélla de un hombre razonable bajo las mismas circunstancias'') diciéndose en la página 743 en parte lo siguiente:

''Niños: A un niño de pocos años no se le requiere que cumpla con las normas de conducta que es razonable esperar de un adulto, pero su conducta debe juzgarse por la norma de conducta que puede esperarse de un niño de similar edad, inteligencia y experiencia. Un niño puede ser tan joven que sea manifiestamente incapaz de ejercitar ninguna de aquellas cualidades de atención, inteligencia y juicio que son necesarias para hacerle capaz de percibir un riesgo y darse cuenta de su carácter irrazonable. Por otra parte, es obvio que un niño que no ha llegado a su mayoridad puede ser tan capaz como un adulto de ejercitar las cualidades necesarias a la percepción de un riesgo y darse cuenta de su carácter irrazonable.

''Entre estos dos extremos hay niños cuya capacidad es infinitamente variable. La norma de conducta requerida de dicho niño es aquélla que es razonable esperar de niños de similar edad, inteligencia y experiencia . . .

''Es imposible fijar una edad definida en la cual los niños son capaces de incurrir en negligencia o fijar la edad en que un niño, o cualquier clase de niños, es capaz de apreciar y afrontar los peligros de una situación determinada.''

Si al caso de autos aplicamos esta sabia doctrina no podemos sostener que la corte inferior erró al resolver que el hijo de los demandantes, pequeño campesino de seis años de

edad, al actuar en la forma en que lo hizo al salir corriendo por el patio de su casa, no actuó en la misma forma en que hubieran actuado "otros niños de su misma edad y en las mismas condiciones y circunstancias que él" pues, como bien hizo constar, además, la corte sentenciadora: "si el niño no podía ver el truck antes de llegar a la casa porque se lo impedía el cuerpo principal de ésta que obstruía su vista y tampoco tuvo aviso alguno de la proximidad del truck, no puede considerarse negligente".

■ Bajo los hechos probados tampoco puede sostenerse, como pretenden los apelantes, que la madre del niño incurrió en negligencia al permitir que éste saliera corriendo cuando se aproximaba el truck. Si el demandado no dió aviso cuando se aproximaba a la casa y la madre del niño vino a darse cuenta de que el truck estaba frente a la cocina cuando ya había ocurrido el accidente, en ninguna forma podía ella evitar que el niño saliera de su lado por el hecho, desconocido para ella, de que el truck se aproximaba a su casa.

■ Los apelantes dedican gran parte de su extenso alegato a argumentar la doctrina de accidente inevitable (*unavoidable accident*) como aplicable a los hechos de este caso y a citar nuestra jurisprudencia y la del Continente al efecto de que cuando una persona ocupa un sitio de seguridad donde se encuentra e inesperadamente lo abandona y se lanza frente a un vehículo de momento, el conductor no es responsable de las consecuencias del accidente. Esta doctrina no es aplicable a los hechos que la corte inferior consideró probados en el caso de autos. Al no dar crédito a la prueba que propendió a demostrar que el accidente ocurrió cuando ya el truck había pasado por completo de la curva y se encontraba más allá o al frente de la cocina de la casa, no erró dicha corte al considerar inaplicable dicha doctrina.

■ En cuanto a la cuantía de la indemnización y de los honorarios de abogado concedidos, somos de opinión que la corte sentenciadora no abusó de su discreción al fijar en

$3,500 la primera. Empero, dadas las circunstancias especiales en cuanto a la forma en que ocurrió el accidente no podemos sostener que los demandados fueron temerarios al defenderse en esta acción, y por tanto, consideramos que dicha corte erró al imponer el pago de honorarios de abogado.

*Debe modificarse la sentencia apelada en el sentido de eliminarse los $300 en concepto de honorarios de abogado y así modificada se confirma.*